# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| CONTESSA M. HORINEK, | ) | CASE NO. 1:19-cv-2141 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| ANDREW SAUL, | ) | |
| *Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Contessa M. Horinek (Plaintiff), challenges the final decision of Defendant Andrew Saul, Commissioner of Social Security (Commissioner), denying her application for Disability Insurance Benefits (DIB) under Titles II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 *et seq*. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this opinion.

## I. Procedural History

On December 2, 2015, Plaintiff filed her application for DIB, alleging a disability onset date of October 9, 2015. (R. 9, Transcript (Tr.) 245-246).[1] The application was denied initially

---

[1] The ALJ's decision indicates that Plaintiff also filed for supplemental security income (SSI). (Tr. 15). Plaintiff's brief does not identify any such application in the record. Nevertheless, this disparity does not appear to have a dispositive impact.

and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 128-244). Plaintiff participated in the hearing on March 15, 2018, was represented by counsel, and testified. (Tr. 30-57). A vocational expert (VE) also participated and testified. *Id*. On July 16, 2018, the ALJ found Plaintiff not disabled. (Tr. 24). On July 23, 2019, the Appeals Council denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4). On September 17, 2019, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11, 13 & 15).

Plaintiff asserts the following assignment of error: "[the] RFC finding is not supported by substantial evidence because the ALJ made conflicting findings with regard to the medical opinions of [a] State agency psychological consultant." (R. 11, PageID# 772).

## II. Evidence

### A. Relevant Medical Evidence[2]

#### 1. Treatment Records

On March 24, 2015, Plaintiff was seen at The Nord Center for a mental health assessment after being referred by her attorney, because Plaintiff lost her temper in a courtroom. (Tr. 352). She had no limitations in activities of daily living and stated that she "can do anything if somebody shows [her] once." *Id*. She was working full time, drives a car, and handled her own chores and finances. *Id*. She reported maintaining normal attendance at work. (Tr. 353). She denied any previous mental health treatment or hospitalization. (Tr. 354). She reported not

---

[2]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

consuming alcohol since 2009, using marijuana "as much as I can," and "uppers" "daily for the past five weeks." (Tr. 355). She had been convicted of domestic violence. *Id.* On mental status examination, Plaintiff's demeanor was mildly blaming, her speech was clear, her activity mildly agitated, and her eye contact was mildly avoidant. (Tr. 389). She was not aggressive, denied suicidal ideation, had no reported hallucinations, was moderately depressed, had logical thought process, was cooperative, had fair to poor insight and judgment, and had a full affect. (Tr. 390). She was diagnosed with major depressive disorder, alcohol use disorder in remission, and cannabis use disorder. (Tr. 389).

On May 22, 2015, Plaintiff was seen by Danielle Haseley, LPC-CR. (Tr. 382-383). She had "irritability, angry outbursts, tearful, isolation, on edge, and racing thoughts." (Tr. 382). On August 21, 2015, Plaintiff reported to counselor Haseley that she had violent thoughts towards her significant other. (Tr. 376). She denied current intent, but indicated she was unable to guarantee his safety because she may snap and lose control. *Id.*

On September 18, 2015, Plaintiff was seen by Patricia Bartosik, MSN, CNS. (Tr. 359-362). She was not taking any medications at that time. (Tr. 360). On mental status examination, she was well-groomed, had mildly blaming demeanor, mildly avoidant eye contact, mildly agitated activity, clear speech, moderate jealousy, moderate feelings of guilt, no risk of self-harm or risk of violence towards others, logical thought processes, moderately depressed mood, full affect, cooperative behavior, normal cognition, average intelligence, and fair to poor insight and judgment. (Tr. 361-363). The diagnoses given were major depressive disorder, alcohol use disorder in sustained remission, and cannabis use disorder. (Tr 361).

On October 9, 2015, Plaintiff was again seen by nurse Bartosik who noted Plaintiff refused to stop smoking marijuana. (Tr. 366-367). Plaintiff was hyperactive, irritable, and had organized

thoughts and full orientation. *Id*. Plaintiff was taking Gabapentin at the time for Restless leg Syndrome and indicated a willingness to try Strattera. *Id*.

On December 11, 2015, nurse Bartosik noted that Plaintiff had some irritability, a constricted affect, organized thoughts, and activities of daily living were within normal limits. (Tr. 465-466). Plaintiff agreed with trial of a mood stabilizer. *Id*.

On December 22, 2015, Plaintiff saw Robin Knott, MSW, LSW. (Tr. 368-369). Plaintiff reported spending time with people recently "to keep me joyful," but also having continued problems with anger and frequent yelling. *Id*. She was unkempt, had a constricted affect, was tearful but with no psychosis. (Tr. 368).

On January 6, 2016, Plaintiff saw social worker Knott, and reported that she "stopped taking most of [her] medication, but [was] doing okay." (Tr. 489-490). She reported not liking her job. (Tr. 489). On January 19, 2016, social worker Knott noted that Plaintiff presented with rapid speech, labile affect, and no psychosis. (Tr. 485). On January 27, 2016, Plaintiff reported to Knott that she was shaking and full of rage. (Tr. 483). She presented with unkempt appearance, constricted affect, was tearful, and loud speech. *Id*. On February 12, 2016, Plaintiff reported to Knott being "more angry;" and she presented with constricted affect and was tearful at times. (Tr. 479). On February 19, 2016, social worker Knott noted Plaintiff reported high levels of irritation, but that she had not "had a rage fit." (Tr. 477-478). She had a constricted affect, rapid speech, no psychosis, and no suicidal or homicidal ideation. *Id*.

On March 1, 2016, Plaintiff saw Rim Ibrahim, M.D., after transferring from nurse Bartosik, stating she never got along with her and was always fighting about her smoking marijuana. (Tr. 463). She reported never having taken the prescribed medications because she did not think she was being diagnosed accurately. *Id*. Her mood was "[a]ngry, fidgety, profane at times, tearful at

times, dramatic. *Id*. Her diagnoses remained major depressive disorder, unspecified attention

deficit hyperactivity disorder, intermittent explosive disorder; alcohol use disorder in remission,

and cannabis use disorder. *Id*. She was prescribed Trazodone for sleep and nightmares, and

Tenex for anger and anxiety, and referred for counseling. (Tr. 464).

On March 23, 2016, social worker Knott Plaintiff, during therapy, was tearful at time and

laughing at others, with a loud, rapid speech. (Tr. 473). On April 8, 2016, Plaintiff reported to

Knott that she had stopped taking her psychotropic medications two day earlier because they

made her tired. (Tr. 471-472). She had a labile affect, and no psychosis or suicidal or homicidal

ideation. *Id*.

On April 19, 2016, Plaintiff saw Dr. Ibrahim for a follow-up, and there was no significant

change from her last visit. (Tr. 461). Her medications were changed to discontinue Trazodone

and Tenex, and she was prescribed Hydroxyzine to reduce rumination, relax, and sleep, and

Strattera for mood and anxiety. *Id*.

On April 27, 2016, social worker Knott noted Plaintiff reported her medication made her

feel like "a ticking time bomb." (Tr. 469). She also reported thoughts of self-harm while on the

medication. *Id*. Plaintiff was observed laughing and then crying, with labile affect, and loud,

rapid speech. *Id*.

On May 20, 2016, Plaintiff reported to Knott that she was still not taking her medication,

and stated "[t]he first two weeks coming off those meds, I had suicidal thoughts, bad. I had

meltdowns." (Tr. 467-468). She had a labile affect, and no evidence of psychosis or suicidal or

homicidal ideation. *Id*.

On June 14, 2016, social worker Knott noted Plaintiff reported she had numbness, the

shakes, "crazy" anxiety, loss of appetite, and "eating … sleeping pills like candy." (Tr. 515). On

5

July 13, 2016, Plaintiff presented with rapid, tangential speech. (Tr. 513).

On July 25, 2016, Plaintiff saw Dr. Ibrahim and reported Strattera had made her angrier and a risk of self-harm. (Tr. 580). She related continuous fighting with her neighbor before she was able to move to a different place. *Id*. Dr. Ibrahim discontinued Strattera and started Plaintiff on Depakote. *Id*.

On August 10, 2016, Plaintiff was seen by a caseworker at Guidestone. (Tr. 613-619). On mental status examination, she had clear speech, no delusions, no aggressive behavior, no hallucinations, euthymic mood, full affect, cooperative behavior, unimpaired cognition, average intelligence, and no suicidal ideation. (Tr. 616). She was diagnosed with persistent depressive disorder and unspecified anxiety disorder. (Tr. 618). On September 27, 2016, the treatment plan included weekly counseling. (Tr. 620-627).

On December 1, 2016, Plaintiff saw nurse Catherine Filkill for an initial consultation. (Tr. 630). Plaintiff reported currently taking Vistaril. *Id*. On January 26, 2017, Plaintiff stated to case worker Latasha Kennard that she would be returning to the Nord Center for treatment. (Tr. 631).

On February 1, 2017, Plaintiff reported to providers at the Nord Center an increase in anxiety symptoms, that result in her inability to leave the house. (Tr. 566). She stated that her anxiety was triggering anger, which resulted in verbal and physical altercations. *Id*. On mental status examination, Plaintiff had mildly blaming demeanor, mildly agitated activity, mildly racing thoughts, euthymic mood, full affect, mild impairment of attention/concentration, and fair insight and judgment. (Tr. 575).

On May 25, 2017, Plaintiff had a telemedicine appointment with Rim Ibrahim, M.D. (Tr. 576-577). Her Tenex medication made her "queasy and zoned out." *Id*. Tenex was "reducing her anger relatively …." *Id*. Her anxiety attacks were down to 2 to 3 per month. *Id*.

6

On September 26, 2017, Plaintiff reported to Betsy Jarnagin, LPN, that she was not taking the medication prescribed by Dr. Ibrahim, but was taking Prozac prescribed by her primary care provider and was "doing ok" on it. (Tr. 684). Plaintiff was also seen by Dr. Ibrahim, and reported "smoking five blunts a day." (Tr. 686). She had not had a panic attack in the past week. *Id*.

On November 1, 2017, Plaintiff was seen by Dr. Ibrahim for follow-up and reported Prozac was not working. (Tr. 688). She reported anxiety, perspiration and flashbacks. *Id*.

### 2. Opinions Concerning Plaintiff's Functional Limitations

On January 27, 2016, Plaintiff underwent a consultative psychological evaluation performed by psychologist James N. Spindler, M.S. (Tr. 399). She reported applying for disability benefits because she could not "handle life" and had "anger issues." *Id*. She reported not drinking as much alcohol as she used to, but admitted to having six or seven drinks the night before, and no longer attends group meetings. (Tr. 401). She reported occasionally smoking marijuana with her last use the day before. *Id*. She stated that she had never used any other illicit drugs. *Id*. She reported being fired only once from a job after losing her temper; she quit her most recent job as a factory worker to care for her ailing grandmother. *Id*. She indicated that she "has generally gotten along with supervisors, but has often been at odds with coworkers." *Id*. Plaintiff further reported that she typically woke up at 5 a.m., prepares her children for school, attends to chores during the day, that she never naps, sees three friends with whom she enjoys talking, helps her children with homework, bathing, and preparing dinner. (Tr. 402-403). On mental status examination, Plaintiff had normal speech and thought content, she reported problems with her temper, felt depressed when someone close to her passed away, and described herself in negative terms. (Tr. 401-402). Plaintiff stated she worried a lot, but indicated she was not an anxious person. (Tr. 402). She reported that she is "able to go about the community as she

feels she needs," but preferred to go shopping early or late when there were fewer people around. *Id.* Plaintiff was observed to be functioning in the low average range of intelligence, and her judgment was reliable for most routine matters. *Id.* Mr. Spindler diagnosed moderate alcohol use disorder, moderate intermittent explosive disorder, and mild to moderate cannabis use disorder. (Tr. 403). He opined that it seems likely that with continued mental health services, Plaintiff will maintain or improve her current level of mental health and general functioning. *Id.* Mr. Spindler opined that Plaintiff was "capable of understanding, remembering and carrying out instructions in most job settings;" had "the mental ability to sustain a working pace and to maintain a level of attention and of concentration that would be sufficient for most job settings;" had "the ability to respond appropriately to supervision and to at least tolerate coworkers;" and was "capable of responding appropriately to routine work pressures." (Tr. 404).

On February 13, 2016, State Agency psychiatrist Kathleen Malloy, Ph.D., reviewed Plaintiff's medical records, including Mr. Spindler's consultative report to which she assigned great weight. (Tr. 67-70). Dr. Malloy opined that Plaintiff had no understanding and memory limitations; she retained the ability to perform simple and multi-step routine tasks; contact with coworkers should be limited; she retained the ability to have brief, superficial, occasional interaction with coworkers and the public; and she retained the ability to respond appropriately to stress and changes in the work setting, as long as these changes are foreseen and any necessary instruction is given. (Tr. 68-69).

On October 4, 2016, Plaintiff presented for a consultative examination with psychologist Charles Loomis. (Tr. 518-524). She reported last using alcohol in February or March of 2016. (Tr. 520). Plaintiff stated she had quit her most recent job in a production facility to care for her grandmother. *Id.* She reported waking at 6:30 a.m., caring for her children, performing

8

household chores and errands, visiting with her sister and three friends, avoiding her neighbors, reading, listening to the radio, and hiking. (Tr. 520-521). Dr. Loomis found that Plaintiff was cooperative but edgy and tense in her interactions with him; attentional pace and persistence were average and Plaintiff maintained good eye contact. (Tr. 521). On mental status examination, Plaintiff's affect was largely appropriate and her mood mildly depressed; her speech was clear, coherent, and organized; she had no delusions, hallucinations, or confusion; she had good reasoning skills with average intelligence; she had adequate insight; and had some difficulty managing her emotions but is able to maintain herself in the community without unusual assistance. (Tr. 521-522). Dr. Loomis diagnosed moderate oppositional defiant disorder, moderate cannabis use disorder, and unspecified attention deficit hyperactivity disorder. (Tr. 523). Dr. Loomis opined that Plaintiff (1) had "the ability to understand, remember and carry out complex directions"; (2) was "able to perform both simple and multistep tasks"; (3) had "no problems in her most recent employment" with respect to responding appropriately to coworkers and supervisors; and (4) "would appear able to deal with ordinary work demands … and production expectations." (Tr. 523-524).

On October 12, 2016, State Agency psychologist Jaime Lai, Psy. D., reviewed Plaintiff's updated records and consultative examination. (Tr. 99-105). Dr. Lai opined that Plaintiff's statements regarding symptoms were only partially consistent with the total medical and non-medical evidence in the file. (Tr. 101). In addition, Dr. Lai opined that Plaintiff: (1) could understand, remember and carry out both simple and complex directions (Tr. 103); (2) could maintain adequate concentration, persistence, and pace to perform both simple and multi-step tasks, while being "best suited" for tasks that did not require her to work in coordination with others (Tr. 103); (3) had the capacity to relate adequately on a brief, superficial basis in an

environment that entailed infrequent public contact, minimal interaction with coworkers, and no over-the-shoulder supervisor scrutiny, though she was "best suited" for "more solitary positions that require and have minimal expectation of social interaction" (Tr. 104); and (4) retained the ability to respond appropriately to routine stress and minor changes in a work setting, but "would benefit from a setting where she could receive advance notice and gradual implementation for any major changes." (Tr. 104). Dr. Lai provided the following additional explanation:

> At recon[sideration], an updated Y CE [current evaluation] was completed 10/4/16. Functional intelligence estimated to be in average range; immediate and delayed memory functions were in the average limits. She reported frequent use of cannabis and was prescribed Strattera for sx of ADHD; however, she had no difficulty with focusing during examination and her attention, pace and persistence were described as essentially average. Likewise, she is able to persist in daily activities, arising at 6: 30 a.m. to care for her children (e.g., gets them to school, helps them w/ homework). She drives, performs household chores, performs some errands and pays bills online. Although she reported problems w/ coworkers and supervisors in a job she had from 2008 - 2014 that resulted in her being fired, she reported no problems in her most recent job, which she quit in June 2015 to help her grandmother. MER [medical evidence record] shows she is cooperative w/ treatment providers and examiners, although at current CE she presented as mildly depressed and she was described as edgy and tense in her interaction w/ the examiner. She visits w/ her sister and three friends, and a friend brought her to the current exam[.] She reads, listens to the radio, and likes to hike. Clmt has sought community MH [mental health] treatment and medications, and she is able to function adequately in the community without the need for psychiatric hospitalization or emergency mental health services.

(Tr. 104).

**B. Relevant Hearing Testimony**[3]

The VE testified that Plaintiff had past work as a baker, Dictionary of Occupational Titles (DOT) 313.381-010. (Tr. 52). The ALJ posed the following hypothetical question to the VE:

> I'm going to ask you to assume an individual who is 32 years old, has a tenth grade limited education, but she can read and write, perform simple arithmetic,

---

[3] As Plaintiff's brief does not challenge the ALJ's credibility assessment of Plaintiff's hearing testimony, the court foregoes any such recitation. (R. 11; R. 15 at PageID# 803).

> has a work background to which you testified. This individual does not have
> exertional limitations. Non-exertionally she can perform simple routine tasks, and
> need[s] a low-stress environment, specifically no fast pace, strict quotas, and
> frequent duty changes involving superficial interpersonal interactions with
> supervisors and co-workers specifically no arbitration, negotiation or
> confrontation, and no interaction with the general public as a job requirement.

(Tr. 52).

The VE testified that such an individual could not perform Plaintiff's past work as a baker.

(Tr. 52). In addition, the VE identified the following as representative examples of jobs that such

an individual could perform: laundry worker, DOT 361.687-018 (180,000 jobs nationally); wire

worker, DOT 728.684-022, (105,000 jobs nationally); and electronics worker, DOT 726.687-010

(60,000 jobs nationally). The VE stated his testimony was consistent with the DOT, as well as

with the Selected Characteristics of Occupations (SCO). (Tr. 53-54).

The ALJ posed a second hypothetical question to the VE: "I'd like you to assume the same

individual age, education, work background, same residual functional capacities provided to you

previously with the additional limitation, and due to symptoms of medically determinable

impairments, this individual will be off-task at least 20% of the time." (Tr. 54). The VE testified

that such an individual was not competitively employable. *Id*.

Plaintiff's counsel asked the VE to assume the same limitations as in the first hypothetical

with the following additional limitations: "no over the shoulder supervised supervision

and needs advanced notice of changes with gradual implementation of any change -- any major

changes that do occur." (Tr. 54). The VE responded as follows:

> Sometimes those jobs would require some over the shoulder supervision, maybe
> not all, and at the same time, there may not always be advanced notice of changes
> as production is moving along, the individual may just be asked to, you know,
> move to another area or take on a different task. That would – that would be --
> that would be unusual, … -- the limitations that you've given would be -- it would
> be unusual if those were tolerated in a competitive setting. There may be some

11

settings like that, but I don't think most of them would allow for that.

(Tr. 55). The VE agreed with Plaintiff's counsel that such requirements would be akin to an accommodation. *Id*. Finally, Plaintiff's counsel inquired whether the need to work in a solitary environment would eliminate all jobs. *Id*. The VE responded that "there are a few jobs like that, but, gosh, they're very rare. I would say no jobs." *Id*.

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed

12

impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.

2. The claimant has not engaged in substantial gainful activity since October 9, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: personality disorder with oppositional defiant and intermittent explosive features; depressive disorder; anxiety disorder; attention deficit hyperactivity disorder (ADHD); and history of alcohol/cannabis abuse (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform a full range of work at all exertional levels. However, the claimant has the following nonexertional limitations: she can perform simple, routine tasks in a low-stress environment (no fast-pace, strict quotas, or frequent duty changes), involving superficial interpersonal interactions with supervisors and coworkers (no arbitration, negotiation, or confrontation), and no interaction with the public as a job requirement (20 CFR 404.1569a and 416.969a).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on *** 1985 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 9, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-24).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.

*Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Residual Functional Capacity (RFC)**

In the first assignment of error, Plaintiff asserts the RFC determination is not supported by substantial evidence. Specifically, Plaintiff contends the ALJ did not include *all* the limitations assessed by State Agency consultant Dr. Lai to whose opinion the ALJ purportedly assigned "some weight" while ostensibly adopting more restrictive mental functional limitations than Dr. Lai assessed. (R. 11, PageID# 772-774). Plaintiff contends the final RFC is actually *less* restrictive than the opinion offered by Dr. Lai, and that the ALJ did not explain why he omitted certain limitations. *Id*.

A claimant's RFC is an indication of an individual's work-related abilities *despite* their limitations. *See* 20 C.F.R. §§ 404.1545(a).[4] The ALJ bears the responsibility for assessing a

---

[4] Moreover, a claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner, and "[i]f the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, ***the claimant's RFC***, or the application of vocational factors—his decision need only 'explain the consideration given to the treating source's opinion." *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 471 (6th Cir. 2014) (emphasis added) (*quoting Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (internal citations omitted)).

claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 404.1546(c). At the fifth and final step of the disability analysis, if a claimant cannot perform the past relevant work, it must be determined whether the claimant can adjust to other work in light of the claimant's RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this final step, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999); *accord White v. Comm'r of Soc. Sec.*, 312 Fed. App'x 779 (6th Cir. 2009).

An ALJ's finding that a claimant can perform a significant number of jobs must be supported by substantial evidence (*i.e.* that the claimant has the vocational qualifications to perform specific jobs). *Workman v. Comm'r of Soc. Sec.*, 105 Fed. App'x 794, 799 (6th Cir. 2004) (*citing Varley v. Sec'y of Health & Varley*, 820 F.2d 777, 779 (6th Cir. 1987)). Testimony from a vocational expert—in response to a hypothetical question—may constitute such substantial evidence, so long as the hypothetical question accurately accounts for a claimant's physical and mental impairments. *See, e.g., Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 845 (6th Cir 2005) (*citing Varley*, 820 F.2d at 779)). However, "[t]he rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (*quoting Redfield v. Comm'r of Soc. Sec.*, 366 F. Supp.2d 489, 497 (E.D. Mich. 2005)).

Specifically, Plaintiff asserts that State Agency psychologist Dr. Lai included in his opinion two limitations omitted by the ALJ from the RFC. (R. 11, PageID# 772-774). Plaintiff points to opinions from Dr. Lai indicating that she should be limited to a work environment: (1) with no

over-the-shoulder scrutiny; and (2) where she receives advance notice and gradual implementation of work changes. (R. 11, *citing* Tr. 102-104).

The Commissioner points out that the limitations Plaintiff cites from Dr. Lai merely observe that Plaintiff "would benefit" or be "best suited" to work in the conditions described. (R. 13, PageID# 791-792). The Commissioner, therefore, argues that the ALJ was not required to equate statements concerning the optimal or best conditions for Plaintiff to work under absolute limitations without which the Plaintiff could not work. *Id.* The Court agrees that the ALJ was not required to create an optimal work setting for Plaintiff. "Optimal conditions, however, are not necessary ones. The RFC 'is the most you can still do despite your limitations.'" *Jakubiak v. Berryhill*, 337 F. Supp. 3d 80, 85–86 (D. Mass. 2018) (*citing* 20 C.F.R. 416.945(a)(1)); *see also Gonzales v. Colvin*, 213 F. Supp. 3d 1326, 1331 (D. Colo. 2016) ("Identifying the optimal work environment for a claimant does not mean that his RFC is limited to that work setting alone.").

Thus, the RFC only needed to assess the necessary conditions for Plaintiff to work—not Plaintiff's ideal or optimal work environment that would give her the greatest chance for success. The court agrees that Dr. Lai's statements that Plaintiff "*would be best suited* for more solitary positions" and "*would benefit* from a setting where she could receive advance notice and gradual implementation for any major changes" constitute optimal conditions rather than necessary ones. (Tr. 104) (emphasis added). As a result, the court finds no error in the ALJ's failure to explain why these optimal working conditions were not included in the RFC.

Nevertheless, Plaintiff has also challenged the ALJ's failure to discuss Dr. Lai's statement that Plaintiff should have "no over-the-shoulder scrutiny." (R. 11, PageID# 772-774). In full context, after observing that Plaintiff would be "best suited for more solitary positions having minimal social interaction, the ALJ stated "however, [Plaintiff] has the capacity to relate

adequately on a brief superficial basis in an environment that entails infrequent public contact, minimal interaction with coworkers, and *no over-the-shoulder supervisor scrutiny*." (Tr. 104) (emphasis added). The "best suited" modifier is absent from the second part of this compound sentence. As such, the prohibition against over-the shoulder scrutiny is not reasonably construed as merely denoting an optimal as opposed to a necessary work environment. The ALJ's decision accords "some weight" to the State Agency psychological consultant's opinions, which would include Dr. Lai; and further states that "their opinions were generally consistent with the record, including the consultative examiners' reports, although based upon evidence received at the hearing level, including additional treatment notes and the claimant's testimony, the undersigned found a somewhat more restricted mental residual functional capacity." (Tr. 11). Despite claiming to adopt a more restrictive mental RFC than Dr. Lai, the ALJ's RFC did not incorporate the prohibition against over-the-shoulder supervision. (Tr. 20). While it is certainly true that the ALJ was not under any obligation adopt that particular restriction, the ALJ's decision is bereft of any discussion explaining why that particular limitation were not credited.

Although an ALJ's decision is not required to discuss every piece of evidence in the record to support the decision, an ALJ must explain why it did not include the limitations from an opinion of a medical source in determining the claimant's RFC. *See, e.g., Moscorelli v. Colvin*, No. 1:15CV1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016) (*citing Thacker v. Commissioner*, 99 Fed. Appx. 661, 665 (6th Cir. 2004); *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011)). This is particularly important where a State Agency psychologist assessed a restriction, the ALJ accords the author of that opinion "some weight" noting its general consistency with the record, and then purports to adopt even stricter mental limitations. SSR 96-8p provides that "[t]he RFC assessment must always consider and address medical

source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Moscorelli*, 2016 WL 4486851, at *3 (quoting SSR 96-8p, 1996 WL 374184, at *7); *see also Stubbs v. Berryhill*, No. 1:17CV2498, 2018 WL 5255140, at *14 (N.D. Ohio Oct. 22, 2018) (same).

In addition, although the ALJ need only incorporate those limitations accepted as credible into the hypothetical questions, *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *9 (6th Cir. March 15, 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)), the ALJ's decision does not explain why the over-the-shoulder prohibition was rejected. The court, therefore, cannot determine whether the ALJ's hypothetical adequately incorporated all of Plaintiff's limitations. Absent such an explanation, the court cannot find, under the facts of this case, that the ALJ's omission was harmless error. The RFC limited Plaintiff to only "superficial interpersonal interactions with supervisors and coworkers (no arbitration, negotiation, or confrontation)," but, based on the VE's testimony, it is unclear whether any jobs would remain for an individual who could never be supervised over-the-shoulder. (Tr. 54-55). In fact, the VE even agreed with Plaintiff's counsel that such a restriction was akin to an accommodation. (Tr. 55). Therefore, the RFC cannot reasonably be construed as incorporating or encompassing an over-the-shoulder prohibition in light of the VE's testimony.[5] Consequently, the ALJ's failure to explain his rejection of such an opinion was not harmless error.

---

[5] The court's finding that a remand is necessary should not be misconstrued as the court taking any position as to whether the over-the-shoulder supervision prohibition should have been included in the RFC. Rather, on remand, the ALJ should explain whether such a limitation was adopted or rejected. At the Commissioner's discretion, a new hearing may be held with additional VE testimony to clarify the impact of such a limitation.

Accordingly, the ALJ committed error by not explaining why he rejected one of Dr. Lai's restrictions.

## VI. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be REVERSED and REMANDED for proceedings consistent with this opinion.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: July 7, 2020

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985),** *reh'g denied***, 474 U.S. 1111 (1986).**